# No. 24-40815

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Lauralee Richmond,

Plaintiff - Appellant

v.

Team One Contract Services, L.L.C., doing business as TeamOne Logistics,

Defendant - Appellee

---

## On Appeal from
United States District Court for the Southern District of Texas

3:22-CV-282

---

## BRIEF OF APPELLANT LAURALEE RICHMOND

---

SUBMITTED BY:

Ahad Khan
Texas Bar No. 24092624
712 Main Street, Suite 900
Houston, TX 77002
713-401-3558 – Telephone
ak@ahadkhanlaw.com - Email

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cɪʀ Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Team One Contract Services, L.L.C. d/b/a TeamOne Logistics | John Hunter Johnson of Constangy, Brooks, Smith & Prophete, L.L.P. Dallas, TX |
| Team One Contract Services, L.L.C. d/b/a TeamOne Logistics | Tammy C. Woolley of Constangy, Brooks, Smith & Prophete, L.L.P. Birmingham, AL |

| Appellants: | Counsel for Appellants: |
|---|---|
| Lauralee Richmond | Ahad Khan of Ahad Khan Law PLLC, Houston, TX |

/s/ Ahad Khan
Attorney of record for Appellant
Lauralee Richmond

ii

# STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument in this case because it presents important issues regarding the evidence necessary for an employee to demonstrate pretext in employment cases under Title VII of the Civil Rights Act of 1964. Further clarifying this standard will assist lawyers, courts, and commentators alike. The pretext assessment is fact intensive and oral argument will aid the Court in its decision.

# TABLE OF CONTENTS

Contents                                                                          Page(s)

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS ......................................................................................iv

TABLE OF AUTHORITIES..............................................................................1

JURISDICTIONAL STATEMENT ......................................................................4

STATEMENT OF THE ISSUES ...........................................................................4

STATEMENT OF THE CASE ...............................................................................4

SUMMARY OF THE ARGUMENT .....................................................................7

ARGUMENT .........................................................................................................8

STANDARD OF REVIEW……………………………………………………………..8

STATEMENT OF FACTS……………………………………………………………9

ARGUMENT AND AUTHORITIES……………………………………………..26

CONCLUSION ....................................................................................................54

CERTIFICATE OF SERVICE............................................................................55

CERTIFICATE OF COMPLIANCE ...................................................................56

# TABLE OF AUTHORITIES

## CASES

*Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422 (5th Cir. 2017)..........................30

*Allen v. USPS,* 64 F.4th 292 (5th Cir. 2023) ...........................................35

*Black v. Pan Am. Labs.*, LLC, 646 F.3d 254 (5th Cir. 2011)............................28, 33

*Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571 (5th Cir. 2020)....................33, 35

*Burrell v. Dr. Pepper/Seven Up Bottling Group*, 482 F.3d 408 (5th Cir. 2007).....46

*Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015) ..........46, 51

*California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S 272 (1987)......................27

*Campos v. Steves & Sons, Inc.*, 10 F.4th 515 (5th Cir. 2021)…… 31, 32, 33, 35, 46

*Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400 (5th Cir. 2011)..................36

*Dabassi v. Motiva Enters.*, 107 F.4th 500 (5th Cir. 2024) ............................8, 39, 53

*Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117 (5th Cir. 1993) ........51

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) ....................................33

*Donaldson v. CDB Inc.*, 335 Fed. Appx. 494 (5th Cir. 2009)................................53

*EEOC v. Ryan's Pointe Houston.* No. 19-20656, 2022 U.S. App. LEXIS 27079, (5th Cir. Sept. 27, 2022) (unpublished) ................................................43

*Fairchild v. Coryell Cnty.*, 40 F.4th 359 (5th Cir. 2022) .........................................35

*Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017 (5th Cir. 1990).....................51

Fitzpatrick v. Pontotoc Cty., Miss., 612 Fed. App'x. 770 (5th Cir. 2015)..34, 35, 38

*Furnco Constr. Corp. v. Waters*, 438 U.S 567 (1978) ............................................53

*Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002)............................................33, 34, 46

*Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470 (5th Cir. 2015). ....................36

*Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356 (5th Cir. 2013)................................................................................................34

*Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286 (5th Cir. 2024)......................33, 36

*Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224 (5th Cir. 2016)…………………. ........................................................................……………35, 36, 45, 47, 50, 51

*Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374 (5th Cir. 2010). ................52, 53

*Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003). .............................................32, 34

*Lee v. Kansas City Southern Railway Co.*, 574 F.3d 253 (5th Cir. 2009)..............30

*Lindquist v. City of Pasadena*, 669 F.3d 225 (5th Cir. 2012). ................................29

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007). ..................................27

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)...............................27, 53

*Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998)...................................29

*Miles v. Dell, Inc.*, 429 F.3d 480 (4th Cir. 2005) ...................................................29

*Morris v. Town of Independence*, 827 F.3d 396 (5th Cir. 2016)................27, 28, 30

*Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589 (5th Cir. 2007).....................46

*Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798 (5th Cir. 1982).....................45

*Price v. Federal Express Corp.*, 283 F.3d 715 (5th Cir. 2002)...............................32

*Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004) ...............................28

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) .........32, 33, 34

*Rubenstein v. Administration of Tulane Educ. Fund*, 218 F.3d 392 (5th Cir. 2000)... ...............................................................................................................................32

*Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000) ........................40

*Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386 (5th Cir. 2020) ....................35

*Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992)....................................43

*Starnes v. Wallace*, 849 F.3d 627 (5th Cir. 2017) ....................................................53

*Staten v. New Palace Casino, LLC*, 187 Fed. App'x 350 (5th Cir. 2006) ........34, 46

*Tolan v. Cotton*, 572 U.S. 650 (2014). .......................................................36, 45, 53

*Walton v. Bisco Indus., Inc.*, 119 F.3d 368 (5th Cir. 1997)....................................32

*Watkins v. Tregre*, 997 F.3d 275 (5th Cir. 2021) ........................................31, 42, 43

*Willis v. Cleco Corp.*, 749 F.3d 314 (5th Cir. 2014) ...............................................27

*Young v. United Parcel Service*, 575 U.S. 206 (2015)......................................29, 39

## STATUTES

28 U.S.C. § 1291. .......................................................................................................4

28 U.S.C. § 1331. .......................................................................................................4

42 U.S.C. § 2000e .........................................................................................4, 26, 33

## RULES

Fed. R. Civ. P. 56(a)...................................................................................................5

# JURISDICTIONAL STATEMENT

The district court properly exercised subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e, et seq. This Court has jurisdiction under 28 U.S.C. § 1291. Final Judgment was entered on November 19, 2024. ROA.725. Appellant timely filed her notice of appeal on December 17, 2024. ROA.729. This appeal is from a final judgment that disposes of all claims.

# STATEMENT OF THE ISSUES

The issues to be ruled on by this Court are (1) whether there is a genuine dispute as to any material fact about whether Appellee's justifications for terminating Appellant's employment are pretextual; and (2) whether the district court correctly granted judgment as a matter of law on Appellant's claim of pregnancy discrimination.

# STATEMENT OF THE CASE

Appellant Lauralee Richmond ("Richmond") was terminated by Appellee Team One Contract Services, L.L.C. d/b/a TeamOne Logistics ("TeamOne") while seven months' pregnant, ostensibly for deficiencies related to safety records and safety meetings. ROA.567; ROA.571. Specifically, she was terminated for "falsification of safety records and failure to maintain supporting documentation for

observations and safety meetings." ROA.404. Richmond denies she did either. ROA.572-573; ROA.607-608; ROA.610; ROA.612-613; ROA.615.

It is inherently unworthy of credence that Richmond's termination was connected to safety, considering Richmond made monumental safety improvements, earning her a national award. ROA.695. Richmond was jointly employed by UPS and TeamOne. ROA.565. She managed the Freeport terminal. ROA.565. Her safety reforms took the Freeport terminal from last place to first place in its national division in UPS Logistics' ("UPS") safety ranking. ROA.574. In July 2020, Richmond surpassed the milestone of 750,000 accident-free miles, a lofty safety goal set out by TeamOne's COO. ROA.649-650. Her boss at UPS noted that in her first year on the account, Richmond had "completely turned around the safety strategy and program." ROA.649. On April 12, 2021, UPS announced the winners of its 2020 Operations of the Year. ROA.695. There were only three winners in the nation across three categories. ROA.695. The winning Group B operation was Richmond's Freeport terminal. ROA.695.

Richmond learned of her pregnancy in September 2020. ROA.656. A point of contention arose between Richmond and TeamOne's vice president of human resources, about Richmond taking her full allotment of FMLA leave and working post-partum. ROA.572; ROA.620. Both issues were caused by Richmond's pregnancy. After taking a firm stance on these two issues, Richmond was written

up and terminated.  ROA.571; ROA.625.  There is sufficient evidence for a jury to conclude that Richmond's pregnancy motivated her termination.

There is also sufficient evidence to prove TeamOne's justifications for Richmond's termination are pretextual.  Richmond completed driver observations and held safety meetings as required by TeamOne and to the satisfaction of UPS. ROA.587; ROA.611-612.  She met the documentation requirements set out for her in TeamOne's "Safety Engagement Plan."  ROA.256.  Her boss at UPS was not consulted about, or in agreement with, the decision to terminate Richmond. ROA.608.

TeamOne filed a motion for summary judgment on November 6, 2023. ROA.69-96.  Richmond filed a response on November 27, 2023.  ROA.524-553. TeamOne filed a reply on December 4, 2023.  ROA.704-710.  The district court entered an opinion and order granting the summary judgment on November 19, 2024, as well as a final judgment in favor of TeamOne.  ROA.713-725.  Richmond filed a timely appeal.  ROA.729-731.  TeamOne is not entitled to a judgment as a matter of law, as the facts and applicable law demonstrate.

# SUMMARY OF THE ARGUMENT

Applying the proper legal standard for pretext, TeamOne's justifications for Richmond's termination are unworthy of credence. Richmond was terminated for reasons connected to safety despite having an excellent record on safety. ROA.649-650; ROA.695. She fulfilled her enumerated responsibilities, including holding safety meetings and completing and documenting driver observations. ROA.586-587; ROA.611-612.

The district court relied heavily on the assertions of Fisher and Clevenger. These assertions are heavily in dispute; moreover, the assertions of Clevenger did not motivate Richmond's termination, a post hoc justification that is further evidence of pretext.

UPS controlled Richmond's day-to-day conduct on the job, yet her boss at UPS, Whisman, was not consulted, nor in agreement, with the decision to terminate Richmond. ROA.608-609. He even went so far as to question TeamOne's authority to make the decision. ROA.608.

Messmer, TeamOne's vice president of human resources, developed discriminatory animus against Richmond due to friction stemming from her decision to take her full allotment of FMLA leave and not work from home post-partum. ROA.580. Messmer drove the decision to terminate Richmond. ROA.287-292. For

this reason alone, a reasonable juror could find that Richmond's pregnancy motivated her termination.

For the reasons articulated above, a genuine issue of material fact exists on whether TeamOne's justifications for Richmond's termination are pretextual and whether TeamOne is entitled to a judgment as a matter of law.   A reasonable juror could find that Richmond did not commit safety violations warranting termination and that her pregnancy motivated her termination.   Therefore, a fact issue exists as to pretext.   Fact issues preclude summary judgment.   The grant of summary judgment should be reversed and the case should be remanded.

# ARGUMENT

## <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  This Court reviews a district court's grant of summary judgment *de novo*, viewing the evidence and drawing all inferences in the light most favorable to the non-movant.  *Dabassi v. Motiva Enters.*, 107 F.4th 500, 505 (5th Cir. 2024).  Richmond is the non-movant in this case.

## STATEMENT OF FACTS

### A. Richmond's Award-Winning Safety Record

Richmond was terminated by TeamOne while seven months' pregnant, ostensibly for deficiencies related to safety records and safety meetings. ROA.567; ROA.571. Specifically, she was terminated for "falsification of safety records and failure to maintain supporting documentation for observations and safety meetings." ROA.404. Richmond denies she did either. ROA.572-573; ROA.607-608; ROA.610; ROA.612-613; ROA.615.

It is inherently unworthy of credence that her termination was connected to safety, considering that Richmond made monumental safety improvements, earning her a national award. ROA.695. Richmond was employed jointly by TeamOne and UPS. ROA.561; ROA.564-565; ROA.568-570; ROA.578. She managed the Freeport terminal. ROA.565. By June 2020, Richmond's safety reforms had propelled the Freeport terminal to first place in its national division in UPS's safety ranking. ROA.574; ROA.677. In July 2020, Richmond surpassed the milestone of 750,000 accident-free miles, a lofty safety goal set out by TeamOne's COO. ROA.649-650. Her UPS supervisor noted that in her first year on the account, Richmond had "completely turned around the safety strategy and program." ROA.649. On April 12, 2021, UPS announced the winners of its 2020 Operations of the Year. ROA.695. There were only three winners in the nation across three

categories.  ROA.695.  The winning Group B operation was the Freeport terminal Richmond transformed.  ROA.695.

### B. Richmond Is Managed By UPS and Paid By TeamOne

Richmond managed the operations of the Freeport terminal.  ROA.583-585. TeamOne contracts with UPS to provide dedicated fleet services at the terminal in support of UPS's client, Chiquita.  ROA.565; ROA.637.

Richmond's first interview in the job application process was with UPS Regional Director Gerald Whisman ("Whisman"), rather than with a TeamOne employee.  Whisman flew in and spoke with Richmond for close to an hour. ROA.564; ROA.568-570.  Only after interviewing with UPS did Richmond participate in a brief phone interview with Mark Messmer ("Messmer"), TeamOne's Vice President of Human Resources.  ROA.570; ROA.620.  The call with Messmer "was more of a formality" – Richmond had aced the interview with UPS, as Messmer let Richmond know that Whisman "couldn't stop talking about [her]."  ROA.570. On July 9, 2019, TeamOne offered Richmond the job.  ROA.647.  Richmond accepted the offer and was managing the Freeport terminal by the end of July 2019. ROA.584.

Richmond was responsible for the direct management and supervision of truck drivers and support staff at the Freeport terminal.  ROA.585.  Richmond was managing more than twenty drivers by the end of her tenure with TeamOne.

ROA.619.    Support staff reporting to Richmond included Jennifer Zavala ("Zavala"), a dispatcher, and Amanda McElveen ("McElveen"), a payroll clerk. ROA.589; ROA.620.

Richmond reported directly to UPS's Whisman.    ROA.561; ROA.578. Richmond was provided a UPS email address that she used to communicate with both UPS and TeamOne.  ROA.649.  While Richmond might only talk once a week with Patsy White ("White"), TeamOne's Director of Safety and Compliance, during a weekly scheduled safety call and even more sporadically with Messmer, she exchanged daily emails and phone calls with Whisman in addition to sending most of her documentation to him, including safety documentation.    ROA.565-566. Accordingly, Richmond reported primarily to Whisman.

Aside from Whisman and her colleagues at the Freeport terminal, Richmond worked most closely with Bruce Pate ("Pate"), a fellow Operations Manager who worked at the Gulfport, Mississippi terminal in the same dual-employer capacity for TeamOne on behalf of UPS.  ROA.559; ROA.620.  As managers of sister terminals, both Richmond and Pate reported to Whisman, participated in the same conference calls, and exchanged relevant information almost every day.  ROA.560-561.

## C. Richmond's Incredible Safety Turnaround

The Freeport terminal Richmond inherited was far from a model operation. The terminal had witnessed eleven driving accidents in the calendar year prior to

Richmond's arrival. ROA.588; ROA.652. Things were so dire that when Richmond arrived, the Freeport terminal ranked 17th, dead last, in its division according to a safety ranking of terminals compiled by UPS. ROA.574; ROA.588.

Objective results demonstrated that TeamOne's safety plan for the Freeport terminal was not working. Richmond quickly concluded that safety processes at her terminal needed to be completely revamped. ROA.574. In Richmond's words, safety was being actively preached but not actually practiced. ROA.588. Richmond initiated reforms, including revamping the hiring process for temporary drivers, sending daily reports to her team of safe driving miles, and coordinating more closely with UPS's Whisman and Pate in setting safety expectations. ROA.574.

The single most important change Richmond spearheaded was an overhaul of safety meetings at the Freeport terminal. When Richmond started, most drivers were only expected to attend quarterly safety meetings. ROA.575. A more frequent monthly gathering of only a handful of the most tenured drivers at the terminal was labeled as a Comprehensive Health and Safety Process ("CHSP") meeting. ROA.575; ROA.638. Contrary to the name, these CHSP meetings did not cover safety-related topics and were nothing more than a forum for experienced drivers to talk shop in the morning while devouring donuts. ROA.575.

Richmond "found that to be incredibly ineffective" and re-branded the monthly CHSP meeting to feature *every* driver at the terminal so that that a culture

of safety would be established.    ROA.575-576; ROA.638.    Going forward, Richmond held a full safety meeting for *all* the drivers *every* month.  ROA.611-612. To maximize attendance, Richmond scheduled the safety meetings on Fridays, the slowest day of the workweek, at around noon when the Port of Freeport would be temporarily closed.  ROA.576-577.  Driver attendance averaged seventy to eighty percent, and Richmond would follow up separately with drivers who missed the meetings to review the topics covered during them.  ROA.577.

In March 2020, Whisman and Jeff Hudson ("Hudson"), TeamOne's Chief Operating Officer, met with Richmond and her team at the Freeport terminal. ROA.582; ROA.650.  By this time, the beneficial effects of Richmond's safety reforms had taken full effect, and the Freeport terminal had racked up a hefty number of accident-free miles.  To encourage that positive trend, Hudson set a safety goal of 750,000 accident-free miles, promising Richmond's team that he would personally fly back to cook steaks for everyone if the goal was achieved.  ROA.649-650.

By June 2020, Richmond's safety reforms had propelled the Freeport terminal to first place in its national division in UPS's safety ranking.  ROA.574.  On July 23, 2020, Whisman sent an email to White and Hudson, congratulating Richmond and her team for surpassing 750,000 accident-free miles.  ROA.649.  Whisman noted that Richmond had "completely turned around the safety strategy and program." ROA.649.

13

In an email to Hudson in October 2020, Richmond laid out the philosophy that produced the striking turnaround. ROA.654. Admitting that "[i]t's not a perfect science," Richmond highlighted the ability to slow down and cultivate a team dynamic with constant communication among the terminal's drivers. ROA.654. "No one is ever too removed to help the new guy," she wrote, "and my more veteran drivers all get a hand in coaching our new talent and making sure they do well." ROA.654. She summarized by stating "the goal is to create a team of heavy hitters that feel comfortable in every environment and take responsibility for each other getting home safely." ROA.654.

In mid-October 2020, Richmond coordinated with Hudson to schedule the promised steak cookout for a Friday in November to fittingly coincide with a safety meeting held at the Freeport terminal. ROA.663-665. The steak cookout was held on November 13, 2020. ROA.667. Both White and Hudson attended; meanwhile, Whisman extended his congratulations to Richmond on making "great strides" and declared the accident-free milestone "a great victory." ROA.667.

### D. Richmond Informs TeamOne She is Pregnant; Things Take a Turn

On October 2, 2020, shortly after learning she was pregnant, Richmond reached out to TeamOne's human resources ("HR") department to inquire about TeamOne's policy on maternity leave. ROA.656-657. Richmond learned she was eligible for 12 weeks of job-protected unpaid leave under the FMLA. ROA.656.

14

On October 19, 2020, Richmond attempted to bring Messmer into the conversation on how TeamOne planned to cover her desk during her forthcoming maternity leave. ROA.659. Richmond informed Messmer of her intent to take her full allotment of FMLA leave. ROA.659. Richmond also expressed concern that Zavala would not be able to cover both Richmond's operations desk and Zavala's dispatch desk because the demands would be "far too much for any one person to feasibly manage." ROA.659. This was not just Richmond's opinion; rather, in an email sent in January 2021, Whisman advised Hudson and Messmer that Zavala and McElveen would not be able to simply pick up Richmond's responsibilities while Richmond was out on maternity leave. ROA.661.

Richmond concluded her October 19, 2020 email to Messmer by broaching the idea of whether anyone at corporate could cover for her while she was out. ROA.659. There is no evidence that Messmer ever responded to this email. Going forward, Messmer consistently refused to address the topic of Richmond's maternity leave in writing. ROA.579-580.

In mid-November 2020, Richmond had another conversation with Messmer about her upcoming maternity leave, which Richmond later referenced in an email she sent to Messmer on December 9, 2020. ROA.670. Richmond knew by this point that her pregnancy was high risk and would require a C-section. ROA.573. Messmer suggested to Richmond that she could work from home post-partum with

her newborn, which would effectively cause her to forgo maternity leave altogether. ROA.670.

The topic of working from home versus taking maternity leave was the subject of continued back-and-forth between Richmond and Messmer. ROA.573. As Richmond put it: "Messmer certainly expected me to work through my maternity leave and he was quite put out with me." ROA.580. When Richmond declined forgoing maternity leave, Messmer offered that she would simply be doing the same thing she did when she contracted COVID-19, adding that she would not have to be taken off payroll. ROA.573. Richmond countered that having COVID-19 and working from home was "a bit different than having major surgery and a C-section to remove a living human from you." ROA.573. At the crescendo of this back-and-forth, Richmond flatly refused to work through her maternity leave. ROA.573. This is when TeamOne turned up the heat and her problems began.

On December 2, 2020, White delivered Richmond a write-up for alleged failure to submit coaching documents for hard brake incidents involving drivers at the Freeport terminal. ROA.672-673. TeamOne wanted Richmond to put any driver who had more than two hard brake incidents in a week on an escalation plan. ROA.593.

This was contradictory to Richmond's mandate to ensure safety because all hard brakes are not created equal. ROA.626-627. Every time a driver pulled a hard

brake, a GPS pinpoint location was triggered showing Richmond where that hard brake occurred. ROA.626. By way of example, a shuttle driver on a load near downtown Houston could easily rack up four to five hard brakes a day from drivers in traffic cutting them off. ROA.626-627. "That's not an indication of a bad driver, that's an indication of a safe driver, of an aware driver," Richmond testified. ROA.627. On the other hand, if a driver on the interstate heading four hours one way with no traffic hit multiple hard brakes, it was a "good indication that he's either on his phone or he's not paying attention to road conditions." ROA.627. Richmond's nuanced practice of differentiating between the two was endorsed by UPS, including Whisman, who she reported to, and Mike Mathieu, Safety Director for UPS and a former DOT officer and former state trooper. ROA.627.

Moreover, Richmond identified her heavy focus on driver retention as one of her biggest safety implementations. ROA.623. This led her to revamp TeamOne's temporary driver policy. ROA.623. Richmond had advised TeamOne in numerous conference calls that she would not have a fleet left if she implemented a strict liability interpretation of the hard brake violation. ROA.591-592. It was Richmond's obligation to run her operation smoothly and safely, and she would not have been able to do so if she had to fire drivers for circumstances beyond their control. ROA.594.

Richmond was part of an ongoing discussion in which she voiced her consistent opposition to the hard brake policy for over a year, but TeamOne only chose to discipline her for it when she refused to work through her maternity leave. ROA.624-625. Pate was also not submitting this hard brake documentation. ROA.595. Yet only Richmond was written up.

Messmer is listed as Richmond's supervisor on the write-up. ROA.448. It is important to note that Messmer is not an operational employee or safety specialist; rather, he is a human resources employee. ROA.620.

On December 2, 2020, Richmond sent an email to Messmer in which she attached a written response to the write-up she received earlier that day. ROA.675-679. Richmond highlighted the connection between the timing of the write-up and her disagreements with Messmer concerning the nature of her FMLA leave: "It also does not escape my notice that these measures have arisen after I notified Human Resources of my pregnancy and that I intended to take my full FMLA leave." ROA.677-678. Richmond also referenced TeamOne's lack of contingency planning for her upcoming maternity leave, amid its desire for her to work from home as quickly as possible post-partum. ROA.678. Richmond concluded her response by flatly rejecting this idea, affirming her intention "to take the full 12 weeks of FMLA allotted to [her] by federal law." ROA.679.

On December 9, 2020, Richmond emailed Messmer again to inform him that after further consideration, she continued to find his idea that she could simply work from home right after giving birth infeasible "and not something [she was] willing to attempt to do."  ROA.670.  Messmer responded at 11:02 PM that evening and suggested setting up a time to discuss Richmond's leave of absence the next day, before adding that he and White would also be discussing "outstanding safety matters" with Richmond.  ROA.670.  However, when pressed by Richmond to develop a final plan for her maternity leave, Messmer continued to kick the can down the road.  ROA.579-581.

Richmond, six months' pregnant, sent Messmer yet another email about her maternity leave on February 23, 2021.  ROA.567; ROA.681.  Messmer neglected to respond to the email.  However, after Richmond complained to Messmer of disparate treatment, referring to the write-up, due to her refusal to work through maternity leave, Messmer explained in a phone call to Richmond that any complaint she had concerning her discriminatory treatment by TeamOne since informing them of her plan to take maternity leave was "ludicrous and not worthy of discussion." ROA.579-581; ROA.589-590; ROA.683.

### E. Richmond Is Terminated

On March 10, 2021, Richmond was out on the road performing driver observations when she received an unexpected message from Messmer, who had flown into town and wanted to meet in person as soon as possible. ROA.84-85; ROA.606-607. At a nearby restaurant, Messmer informed Richmond she was being suspended for not holding safety meetings and for forging documentation. ROA.607-08. Both of these allegations are false and Richmond immediately denied them. ROA.607-608.

After returning to her office, Richmond gave Whisman a call to inform him of the situation. ROA.608-609. Whisman was totally in the dark about what just transpired, despite the alleged grounds for Richmond's suspension centering on documents she was regularly sending to him. ROA.608-609. Richmond recalls that Whisman became upset upon hearing the news, employed "some pretty colorful language," and was adamant that he had not approved the action taken against Richmond, even going so far as to say that TeamOne "did not have permission to fire" Richmond. ROA.608.

Nevertheless, Richmond learned of her termination via a phone call from Messmer, two days later on March 12, 2021, two months to the day before the birth of her baby. ROA.567; ROA.571. In addition to Whisman, Pate also expressed that he thought Richmond's termination was unfair and unjustified. ROA.562-563.

Zavala replaced Richmond as TeamOne's Operations Manager at the Freeport terminal. ROA.642; ROA.688. It is evident that Richmond's award-winning safety culture did not carry over into Zavala's reign, which was plagued with allegations of alcohol consumption on the job, leading to Zavala's termination. ROA.642. TeamOne has admitted terminating Zavala but declined to elaborate on the reasons for its decision. ROA.688.

On April 12, 2021, UPS announced the winners of its 2020 Operations of the Year. ROA.695. There were only three winners across the nation in three categories. ROA.695. The winning Group B operation was the Freeport terminal Richmond transformed. ROA.695.

## F. Richmond Held Monthly Safety Meetings

On March 4, 2021, Zavala responded to an email from White about CHSP meetings with the question: "What is the CHSP meeting?" ROA.697. Zavala's ignorance cannot be attributed to Richmond because Zavala's employment with TeamOne predated Richmond's. ROA.616. This touched off the events that TeamOne asserts led to Richmond's termination. However, Zavala seems to recall exactly what a CHSP meeting is the following day, when she reported to White that one had not occurred since before Richmond's tenure. ROA.82. Meanwhile, the record demonstrates that Zavala and McElveen's ensuing "complaint" about Richmond was not organic. ROA.701.

Zavala was in conversation with White on March 4, 2021 during which she reported: "Amanda [McElveen] and I will have a list of things for you tomorrow" and added "[w]e are both relieved to know you are working on this." ROA.701. That same day, White relayed to Hudson and Messmer that Zavala had told her that Richmond was telling coworkers that "she may not come back from maternity leave." ROA.491. This is contradicted by Richmond's sworn testimony, as she told both Zavala and others of her intention to return to work following her maternity leave. ROA.142.

On March 5, 2021, Zavala communicated to White an allegation that a purported February 23, 2021 CHSP meeting never took place and that a formal CHSP meeting had not been held at the Freeport terminal since before Richmond's tenure. ROA.82. This is true but simply explained. Richmond did away with the CHSP designation (originally a monthly driver-led meeting of only four or five senior drivers comprising the CHSP committee) in an effort to improve safety at the previously struggling Freeport terminal. ROA.575; ROA.612; ROA.617-618. Richmond disbanded the smaller CHSP committee and in effect made "every driver a member of the CHSP" in that they all now attended a monthly safety meeting. ROA.575; ROA.617-618. This placed a greater emphasis on safety because Richmond had "all the drivers come in every month instead of five drivers once a

month and all the drivers quarterly." ROA.617-618. Put simply, "[e]verybody became a CHSP member, we just didn't call it that anymore." ROA.618.

Everybody included not just the drivers but also Zavala, who was not only present for the monthly safety meetings but also spoke at them "every month." ROA.616. Just as the monthly safety meetings were known by everyone who worked at the Freeport terminal and therefore attended them, they were likewise well known to TeamOne's management team. ROA.612. Even TeamOne's Chief Operating Officer, Hudson, knew how Richmond conducted and documented her safety meetings, as evidenced by Hudson's response to White expressing concern: "Didn't this come up before and Lauralee explained? She was doing something in lieu of or something." ROA.612; ROA.697.

When Richmond began holding the safety meetings monthly, Whisman told her to use the CHSP form to document them. ROA.613-614. Meeting dates on the forms may not have always been exact, in that they did not occur on the same Friday every month, but they did indeed occur monthly. ROA.614. This can be proven by food receipts in expense reports Richmond submitted to TeamOne, which would allow for the reconstruction of precise dates. ROA.614-615. As Richmond explained, "there was always corresponding receipts…if you're feeding thirty guys kolaches in the mornings you're gonna know." ROA.615.

23

## G. Richmond Did Not Falsify Safety Records

Driver observations were the part of Richmond's job that she took the most seriously and proved to be, in her mind, "instrumental in revamping the safety program" at the Freeport terminal. ROA.586. Richmond exceeded the minimum required observations weekly and scheduled her day around the drivers' schedules so she would catch them coming into or leaving the port. ROA.587; ROA.604. To conduct these observations, Richmond had to leave the office and document a driver in the yard or out on the road. ROA.586. A driver was without warning and unaware he was being observed. ROA.586. Everything from pre-trip to post-trip was rigorously scrutinized to ensure best safety practices were being strictly adhered to by the drivers. ROA.586-587. This included observing driving habits, mannerisms, speed, turn signaling, as well as loading and unloading. ROA.586-587. Richmond submitted a spreadsheet of driver observations to UPS each week that contained observations on five to seven randomly selected drivers. ROA.587. These driver observations were not submitted to TeamOne but went directly to UPS's Whisman. ROA.596-597.

Early in her tenure, Richmond quickly determined that Zavala was simply going through the motions on driver observations by submitting the same thing over and over again – "[D]river performed good pre-trip." ROA.601. When Richmond asked Zavala about it, Zavala admitted she was not even leaving her desk when

making these purported observations. ROA.601. This kind of observation would have been impossible because the yard where drivers parked was located several blocks away from the terminal office. ROA.605. In actuality, Zavala was the one falsifying driver observations.

Richmond conferred with Whisman about the matter and was told not to concern herself with the situation so long as Richmond was willing to make up the difference in driver observations. ROA.601. The fact that Richmond was conducting all observations at the Freeport terminal was not a secret; rather, it was known by Whisman, Mathieu, and Eileen Stone (UPS's President of Truckload Division), as well as White, who was told the very first time she visited the Freeport terminal. ROA.602; ROA.610. Richmond also told White on multiple occasions that Whisman explicitly instructed Richmond to keep Zavala's name on the driver observation forms even though Zavala was no longer performing observations. ROA.603. While Whisman's reasoning for wanting the driver observations done this way is unclear, Richmond was told by TeamOne that they would do whatever it took to keep their client, UPS, happy. ROA.603-604. Thus, any inaccuracies in the driver observations were the result of UPS's express instructions and not the result of any independent action by Richmond. In fact, prior to Richmond's termination, only UPS ever took an interest in these observations, as evidenced by Whisman's

reaction to TeamOne's sudden request: "there's no reason for them to be asking for that, they've never asked for it before." ROA.606-607.

It is undisputed that Richmond did not use the updated driver observation form that White emailed to her in March 2020. ROA.77; ROA.598-600. However, Pate was not submitting the updated driver observation forms either. ROA.600. In fact, Pate submitted the same spreadsheet for driver observations as Richmond. ROA.597. Richmond was able to confirm this because on one occasion Pate was called out for an emergency and relayed his driver observations to Richmond, who then submitted on Pate's behalf. ROA.597. When asked, Pate confirmed that he had never seen or used the form in question in his fourteen years of experience as a terminal manager. ROA.621-622. Even though Pate, not pregnant, was also not submitting driver observations on the form that White asked for, only Richmond, seven months' pregnant, was terminated. ROA.598-600.

## ARGUMENT AND AUTHORITIES

### A. Legal Standards for Pregnancy Discrimination

Title VII of the Civil Rights Act of 1964 prohibits discrimination with respect to the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a). In 1978, the Pregnancy Discrimination Act amended Title VII to include discrimination "on the basis of pregnancy, childbirth, or related medical conditions" within the composition of unlawful sex discrimination. 42 U.S.C. § 2000e-(k).

As observed by the Supreme Court, "the entire thrust" behind the amendment was "to guarantee women the basic right to participate fully and equally in the workplace, without denying them the fundamental right to full participation in family life." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S 272, 289 (1987) (internal quotation omitted).

Because discriminatory intent is rarely overt, a plaintiff may present a case based on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, the plaintiff may make a prima facie case of discrimination by showing that she: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group." *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016) (*quoting Willis v. Cleco Corp.*, 749 F.3d 314, 319-20 (5th Cir. 2014)).

After the plaintiff establishes a prima facie case, "the burden then shifts to the employer to provide a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

After the employer does so, the burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black v. Pan Am. Lab., LLC*, 646 F.3d 254, 259 (5th Cir. 2011) (*quoting Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (alteration in original).

## B. <u>Richmond Makes a Prima Facie Case</u>

TeamOne does not contest the first three elements of Richmond's prima facie case, but argues she cannot establish the fourth element: that she was replaced by a non-pregnant employee or was treated less favorably than a similarly situated non-pregnant employee. *See Morris*, 827 F.3d at 400 (5th Cir. 2016); ROA.88.

The fourth element of a prima facie case features an "or" test, requiring Richmond to show that she "was replaced by someone outside [her] protected group *or* was treated less favorably than other similarly situated employees outside the protected group." *Morris*, 827 F.3d at 400. (emphasis added). Nevertheless, Richmond satisfies both parts of the test.

First, Zavala, a non-pregnant employee, replaced Richmond. ROA.642; ROA.688. This alone satisfies the fourth element. Importantly, in a pregnancy discrimination case, the correct test for an employee "outside the protected group"

28

is whether the individual is a non-pregnant employee, not whether the individual is a male. *See Young v. United Parcel Service*, 575 U.S. 206, 210 (2015), (the Pregnancy Discrimination Act requires a court to examine whether an employer "treats pregnant workers less favorably than it treats nonpregnant workers"); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1060 (5th Cir. 1998) ("appropriate comparison is…between pregnant and nonpregnant workers, not between men and women") (internal quotations omitted); *Miles v. Dell, Inc.*, 429 F.3d 480, 490 n.7 (4th Cir. 2005) ("for purposes of establishing a prima facie case of pregnancy discrimination, the protected class is pregnant women, not all women" and "replacement by a non-pregnant female, just as replacement by a male," is enough to satisfy the fourth element of a prima facie case).

Second, Richmond also satisfies the second part of the fourth element, because Pate, a similarly situated non-pregnant employee, was treated more favorably than her.  Pate is a valid comparator.  The requirement that a single plaintiff's "comparators be 'similarly situated' is not a requirement susceptible to rigid, mechanical application—'there is no precise formula to determine whether an individual is similarly situated to comparators.'"  *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012).  The inquiry as to if an employee is "similarly situated" is "case-specific" and requires an analysis of "the full variety of factors that an objectively reasonable…decisionmaker would have found relevant in making

the challenged decision." *Id.* at 234. The "case-specific" requirement exists because "[w]hat is relevant in one case might not be relevant in another." *Id.* Upon a sufficient showing of similarity by the plaintiff, the inquiry of whether an employee is similarly situated is "often reserved for the fact-finder." *Morris*, 827 F.3d at 402.

While comparators should involve situations that are nearly identical, courts "do not, however, interpret 'nearly identical' as synonymous with 'identical.'" *Lee v. Kansas City Southern Railway Co.*, 574 F.3d 253, 260 (5th Cir. 2009). The Fifth Circuit has noted that "[a]pplied to the broader circumstances of a plaintiff's employment and that of [her] comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Id.* "Lest there be any doubt, the Title VII comparator must be similarly situated—not identical." *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 427 n.10 (5th Cir. 2017). "[I]t is sufficient that the ultimate decisionmaker as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor." *Lee*, 574 F.3d at 260-61 (5th Cir. 2009).

Pate is a comparator to Richmond because he managed the sister terminal to Freeport; he held the same job title, Operations Manager; he performed the same job duties; and he reported to the same individual, Whisman. ROA.559-561; ROA.620.

The argument that Pate is not similarly situated because he did not falsify safety documentation is unavailing because Richmond also did not falsify safety documentation.  ROA.572-573; ROA.607-608; ROA.610.

In *Watkins v. Tregre*, the Fifth Circuit focused its comparator analysis solely on the only undisputed infraction of sleeping on the job, despite the fact that the employer offered evidence of "a variety of deficiencies" and "additional examples of poor performance," citing its duty to avoid weighing the evidence in the employer's favor.  *Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021).  Likewise, the comparator analysis here should be focused on the sole infraction of not using TeamOne's requested driver observation form, because in weighing the evidence in the light most favorable to the nonmovant, Richmond, that is the only one of the alleged infractions that is not in dispute.  *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 518 (5th Cir. 2021) (asserting "we will view the events in this case through the non-movant employee's relevant evidence, even if disputed, and the employer's undisputed evidence.").

Ultimately, a reasonable juror can determine that Pate was similarly situated and treated more favorably in that he was not terminated for his documentation whereas Richmond was.  For his part, Pate himself thought Richmond's termination was unfair and unjustified.  ROA.562-563.

### C. **Richmond Establishes Pretext**

### 1.     **Legal Standards for Pretext**

The district court concluded that Richmond did not produce "substantial" evidence of pretext.  ROA.724 ("Because Richmond has not produced substantial evidence of pretext, TeamOne is entitled to summary judgment.").  But "substantial" evidence does not require a heightened showing, inconsistent with summary judgment standards.  To the contrary, "[e]vidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions." *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003) (internal quotation marks omitted); *Campos*, 10 F.4th at 529 (5th Cir. 2021).  This mirrors the summary judgment standard of whether a reasonable factfinder may return a verdict for the non-movant.

The district court, quoting a 2002 case, *Price v. Federal Express Corp.*, also contended "Richmond 'must substantiate h[er] claim of pretext through evidence demonstrating that discrimination lay at the heart of [TeamOne's] decision." ROA.722 (quoting *Price*, 283 F.3d 715, 720 (5th Cir. 2002)).  However, as demonstrated below, that is not the law.  For its part, the opinion in *Price* quoted a 2000 case, *Rubenstein v. Administration of Tulane Educ. Fund*, 218 F.3d 392 (5th Cir. 2000), which in turn quoted a 1997 case, *Walton v. Bisco Indus., Inc.*, 119 F.3d 368 (5th Cir. 1997), which was decided before the Supreme Court's decision in

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), and uses the standard expressly disclaimed by *Reeves* and the many opinions of this Court that followed *Reeves*. The correct standard is outlined below.

In the final stage of the burden-shifting scheme, the employee may show either (1) that the employer's reason is not true or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's pregnancy. *Black*, 646 F.3d at 259 (5th Cir. 2011). Because Title VII prohibits "any employment practice" motivated even in part by sex (including pregnancy as of the 1978 amendment), an employee may still establish liability "even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *Campos*, F.4th at 529 n.4 (5th Cir. 2021); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

"Pretext can be proven by *any* evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020) (emphasis added); *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 297 (5th Cir. 2024). Summary judgment is "inappropriate" where the employee "has provided sufficient evidence to cast doubt on the employer's explanation" for its challenged employment action. *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002).

The fact that the employer's reason is false or unworthy of credence gives rise to an inference of pretext. *Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n.10 (5th Cir. 2013) (reversing grant of summary judgment and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence. . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original); *Fitzpatrick v. Pontotoc Cty., Miss.*, 612 Fed. App'x. 770, 774 (5th Cir. 2015).

An employee's prima facie case "combined with sufficient evidence to find that the employer's asserted justification for its action was false, may permit the trier of fact to conclude that the employer unlawfully discriminated" without the plaintiff introducing additional and independent evidence of discrimination. *Reeves*, 530 U.S. at 148-49 (2000). Thus, "[a] prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability." *Id.* at 149; *Laxton*, 333 F.3d at 578 (5th Cir. 2003); *Staten v. New Palace Casino, LLC*, 187 Fed. Appx. 350, 358-359 (5th Cir. 2006); *Gee*, 289 F.3d at 348. The United States Supreme Court has developed this formula because "there will seldom be eyewitness testimony to the employer's mental processes." *Reeves*, 530 U.S. at 141 (quotations omitted).

A "genuine issue of material fact" as to the veracity of the employer's reason for termination "precludes summary judgment." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 237 (5th Cir. 2016); *Fitzpatrick*, 612 Fed. Appx. at 774 (5th Cir. 2015); *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020) (holding an employee can meet its burden by showing "that reasonable minds could disagree about whether these were, indeed, the reasons for her discharge.").

In addition to showing that the employer's proffered explanation is false or unworthy of credence, a plaintiff may also show pretext through evidence of disparate treatment. *Allen v. USPS*, 64 F.4th 292, 301 (5th Cir. 2023) (internal quotations and citations omitted); *Brown*, 969 F.3d at 580 (pretext can be shown by demonstrating that similarly situated employees were treated more favorably).

The lens through which the evidence is viewed must always be in the light favorable to the party opposing summary judgment. *Fairchild v. Coryell Cnty.*, 40 F.4th 359, 363 (5th Cir. 2022) ("As is always true at summary judgment, the facts must be viewed in favor of the nonmovant."). As this Court has put it, "we will view the events in this case through the non-movant employee's relevant evidence, even if disputed, and the employer's undisputed evidence." *Campos*, 10 F.4th at 518 (5th Cir. 2021).

In determining whether an employer's reason for termination is legitimate or pretextual, "a finder of fact must weigh the evidence." *Heinsohn* 832 F.3d at 245

(5th Cir. 2016). A court who weighs the evidence and resolves disputed issues in favor of the moving party does so improperly. *Id.*; *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015) (quotations omitted). Instead, a court "must disregard all evidence favorable to the moving party that the [finder of fact] is not *required* to believe. *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 407-408 (5th Cir. 2011). At the summary judgment stage a court "may make no credibility determinations." *Id.*

Accordingly, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). "We would necessarily wade into making credibility determinations, weighing the evidence, and drawing inferences. This we cannot do." *Harris*, 92 F.4th at 298 (5th Cir. 2024). A reasonable juror can find for the employee even in the face of "substantial evidence" of "poor performance." *Harris* 92 F.4th at 298 (5th Cir. 2024).

## 2.      TeamOne's Justifications Are Unworthy of Credence

TeamOne's reason for terminating Richmond is "her falsification of safety records and failure to maintain supporting documentation for observations and safety meetings." ROA.85. This is unworthy of credence because the allegation starkly contradicts the praise Richmond won for positive performance. TeamOne's rationale requires one to believe that the terminal under Richmond's leadership

achieved objectively great results in the area of safety, but Richmond was somehow also deficient in managing her team.

The district court concluded that "Richmond has produced no evidence suggesting that it was unreasonable for TeamOne to rely on Fisher's statements in terminating Richmond for falsifying documentation." ROA.724. But this was unreasonable.

The fact that Richmond was falsifying safety documentation is rebutted by the facts that (1) she made a sweeping turnaround in the safety record of the Freeport terminal; (2) Whisman, her boss at UPS, was satisfied with her performance; (3) the Freeport terminal was ranked number one out of seventeen terminals in its class; and (4) the Freeport terminal won "Operation of the Year" under Richmond's leadership. ROA.649; ROA.667; ROA.574; ROA.695.

Richmond took the Freeport terminal's safety operation from the outhouse to the penthouse, as evidenced by her climb from last to first in UPS's terminal safety rankings. ROA.574. Accepting TeamOne's justification for Richmond's termination, she did so without conducting safety meetings or driver observations. This claim defies belief and is unworthy of credence.

Likewise, the argument that Richmond was terminated for failure to conduct and document driver observations is unworthy of credence. Richmond made driver observations her number one priority, scheduled her day around the practice, and

submitted more than the required number of driver observations.     ROA.587; ROA.604.  This very practice helped her turn around the safety performance of the Freeport terminal.  These driver observations were submitted solely to UPS under the sole supervision of UPS, who had no objections with Richmond's conducting of all driver observations herself or her documenting of the same.  ROA.596-597. Rather, UPS told TeamOne that based on Richmond's performance, her "policies were sound."  ROA.625.

Just a month after Richmond's termination, the Freeport terminal was awarded the national title of UPS "Operation of the Year."  ROA.695.[1]

When the employer's justification relies on a convenient or unlikely coincidence, such as the disparity here between Richmond's alleged safety practices and actual safety record, the "suggestion that it is merely coincidental" can "be taken by a jury to further erode [the employer's] veracity." *Fitzpatrick*, 612 Fed. Appx. at

---

[1] In responding to the comparisons to a team firing a coach who has the best record in the league or cutting a player amidst an MVP season, the district court draws on the non-analogous examples of Art Briles, Trevor Bauer, and Bobby Petrino, all of whom were released by their employers because of allegations of sexual misconduct outside of work.     ROA.722.     Specifically, Briles faced widespread allegations of sexual assault committed by members of his football team, Bauer was accused of violent sexual assault, and Petrino was accused of engaging in and hiding a sexual affair with his assistant.  For the record, Bauer was ultimately proven to be innocent of the allegations against him and his accuser was indicted for criminal fraud and extortion.  Petrino was re-hired by his employer in 2024.  Briles threatened to sue for wrongful termination and settled his claims for $15.1 million.

at 775.  As can the fact that Whisman, who directly supervised Richmond, was not informed of or agreed to her discipline.  ROA.561; ROA.578; ROA.608.

Moreover, while it was Whisman's decision to not have Zavala perform observations and for only Richmond to do so, there is no evidence that Zavala was ever disciplined for failing to perform driver observations every week.  ROA.596.  It is undisputed that TeamOne's safety policy requires both managers and supervisors to perform weekly driver observations.  ROA.256; ROA.596.  However, only Richmond was terminated while Zavala was not.

Finally, the fact that Richmond's safety and documentation practices were largely consistent throughout her tenure but only came under scrutiny after her refusal to work through her maternity leave, further demonstrates pretext.  TeamOne could have disciplined Richmond at any time; yet they only chose to terminate her in March 2021, two months before she gave birth.  ROA.567; ROA.571.

The Supreme Court held that in establishing pretext in a pregnancy discrimination case, "a plaintiff may rebut an employer's proffered justifications by showing how a policy operates in practice."  *Young*, 575 U.S. at 230 (2015).

The employer's purported reason "may be taken by a fact finder as not credible."  *Dabassi*, 107 F.4th at 507 (5th Cir. 2024) (reversing grant of summary judgment for employee who was both awarded and disciplined for his performance).  A reasonable fact finder can find TeamOne's justifications not credible.

### 3. Messmer Harbored Animus

A jury may find that Messmer harbored discriminatory animus.  Even if Messmer was not the sole final decision-maker, the fact that he harbored animus and influenced TeamOne's termination decision makes TeamOne liable under the "cat's paw" theory, which this Court adopted in 2000.  *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000).

On October 2, 2020, shortly after learning she was pregnant, Richmond reached out to HR to inquire about TeamOne's policy on maternity leave.  ROA.656-657.  Richmond learned that qualified employees receive 12 weeks' worth of unpaid leave under the FMLA and HR Generalist Elizabeth Demeritte confirmed to Richmond that she was an FMLA-eligible employee.  ROA.656.

Soon after learning she was pregnant, in October 2020, Richmond informed Messmer of her intent to take her full allotment of FMLA leave and also use her accrued vacation time, as both of her prior scheduled trips in 2020 were cancelled because of the pandemic.  ROA.659.  There is no evidence that Messmer ever responded to this email.  Going forward, Messmer consistently refused to address the topic of Richmond's maternity leave in writing, a suspicious move by a human resources professional.  ROA.579-580.

In November 2020, Richmond had another conversation with Messmer about her upcoming maternity leave.  ROA.670.  Richmond knew by this point that her pregnancy was high risk and would require a C-section.  ROA.573.

The topic of working from home versus taking maternity leave became a sore subject between Richmond and Messmer.  ROA.573.  As Richmond explained, "Messmer certainly expected me to work through my maternity leave and he was quite put out with me."  ROA.580.

Messmer suggested to Richmond that she could work from home post-surgery with her newborn, which would essentially entail her foregoing maternity leave altogether.  ROA.670.  When Richmond declined forgoing maternity leave, Messmer offered that she would simply be doing the same thing she did when she contracted COVID-19 and added that she would not have to be taken off payroll.  ROA.573.  Richmond countered that having COVID-19 and working from home was "a bit different than having major surgery and a C-section to remove a living human from you."  ROA.573.  At the crescendo of this back-and-forth, Richmond flatly refused to work through her maternity leave.  ROA.573.

The events that followed are encapsulated by Richmond: "Shortly after that, I had been written up.  And before you could blink, I was fired."  ROA.573.

The same day she was written up, Richmond noted the connection between the timing of the write-up and her disagreements with Messmer concerning her

election to maximize her FMLA leave: "It also does not escape my notice that these measures have arisen after I notified Human Resources of my pregnancy and that I intended to take my full FMLA leave."  ROA.677-678.

On December 9, 2020, Richmond emailed Messmer again to inform him that after further consideration, she continued to find his idea that she could simply work from home right after giving birth infeasible "and not something [she was] willing to attempt to do."  ROA.670.

Messmer responded late that night at 11:02 PM and suggested setting up a time to discuss Richmond's leave of absence the following day, before adding that he and White would also be discussing "outstanding safety matters" with Richmond the next day, foreshadowing her termination a few months later.  ROA.670.

On February 23, 2021, Richmond sent yet another email to Messmer about her maternity leave.  ROA.681.  Messmer again did not respond in writing. However, Messmer expressed in a phone call to Richmond that her concern about TeamOne's negative change in treatment after notification of her plan to take full FMLA leave was "ludicrous and not worthy of discussion."  ROA.579-581, ROA.589-590; ROA.683.

A factfinder can disagree with Messmer's assessment and find that Richmond's election to take her full allotment of FMLA and her decision to not work from home post-partum motivated her termination a few weeks later.  *See Watkins*,

997 F.3d at 285 (5th Cir. 2021) (concluding genuine issue of material fact existed when "suspicious sequence of events le[d] up to [employee's] firing."); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) (noting it is "surprising that suddenly, after Shirley filed her EEOC complaint, problems with her work surfaced.").

In addition, an employer expressing disagreement with an employee's choice to take her full allotment of FMLA leave has been held by this Court to inform a finding of pretext in a pregnancy discrimination case. Although unpublished, *EEOC v. Ryan's Pointe Houston* is directly on point. No. 19-20656, 2022 U.S. App. LEXIS 27079, *19-20 (5th Cir. Sept. 27, 2022) (unpublished). In supporting a finding of pretext, this Court highlighted that the pregnant employee's supervisor was frustrated because she would seek to take her full FMLA leave entitlement. This Court found that the totality of the circumstances indicated pregnancy arguably played a role in the ultimate decision to terminate her employment, and this was sufficient to demonstrate pretext.

### 4.    Fisher's Assertions to TeamOne are Heavily Disputed

The district court chides Richmond for not mentioning Fisher in her response despite the fact that "TeamOne fired Richmond, in part, because she documented 'a verbal warning' to Fisher 'for failing to honk his horn,' but Fisher said that conversation never happened.'" ROA.723. While it is true that Richmond does not

mention Fisher by name, she does rebut the specific allegation Fisher makes; namely, that she falsified documentation.  ROA.538; ROA.541-542.

Moreover, there is ample evidence in the record that Fisher's statements are in dispute, in addition to the fact that Richmond herself documented the "verbal" warning Fisher says never happened.  ROA.617.

Richmond testified to the following at deposition:

- "Ricky Fisher is 100 percent lying."  ROA.134.

- "I talked to Ricky almost all day every day."  ROA.134.

- "I was fired for lack of documentation, several other things that absolutely weren't true."  ROA.113.

- "I said absolutely no, I'm not [forging documentation]."  ROA.608.

- "I wasn't falsifying documents."  ROA.129.

The he-said, she-said between Fisher and Richmond involves a credibility determination.  This credibility determination is reserved for the jury, not the district court on summary judgment.

Another significant fact issue is that Richmond disputes Messmer's recounting of their conversation about this subject.  In his memorandum detailing his termination meeting with Richmond, Messmer describes without specifics that Richmond admitted to it.  ROA.292.  Richmond both denies the underlying

allegation of fabrication and that she admitted it to Messmer in their conversation. ROA.129; ROA.607-608.

In a swearing match, a plaintiff's own testimony cannot be ignored. *Tolan*, 572 U.S. at 657 (2014). Moreover, to "signal that an employee's account could never prevail over an employer's…would render an employee's protections against discrimination meaningless." *Heinsohn* at 245.

Further evidence of pretext can be found in the fact that Fisher—who has been friends with Zavala for thirty years and is referred to as "Uncle Ricky" by Zavala's children—did not organically report this to TeamOne. ROA.134. Rather, Zavala called and spoke privately to Fisher, and then relayed the information to TeamOne. ROA.290. Messmer then reached out to Fisher himself and interviewed him. ROA.290. We do not have emails, text messages, transcripts, recordings, or contemporaneous notes of what exactly was discussed, but we do have a recounting in an internal TeamOne memorandum. ROA.289-291.

As demonstrated above, a factfinder can easily conclude that Messmer harbored animus motivated by Richmond's legally protected pregnancy and FMLA leave. In a different context, this Court has held that employer "procedures [that] rely heavily on the subjective judgments of its executives from personal interviews [create] a procedure that can easily be used to mask [discriminatory] decisions." *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 824 (5th Cir. 1982).

### 5.     Clevenger Was Not a Reason for Richmond's Termination

In support of its grant of summary judgment, the district court relies heavily on Clevenger—a UPS employee—and his emails back and forth with TeamOne. However, Clevenger was not cited as a reason for Richmond's termination *at the time*. Clevenger's appearance is post hoc, appearing for the first time at the summary judgment stage. Not only was Clevenger never mentioned by TeamOne in its hours-long deposition of Richmond, but he was also never cited as having anything to do with her termination in TeamOne memoranda or supporting documentation attached to Richmond's termination form. ROA.101-147; ROA.287-292.

In fact, Clevenger is mentioned 20 times in the district court's order and opinion, 3 times in the motion; and *never* in the contemporaneous memoranda detailing TeamOne's reasons for the termination. ROA.69-96; ROA.287-292; ROA.713-724.

This Court has consistently held that shifting explanations by an employer is evidence of pretext. *Gee*, 289 F.3d at 347-48 (5th Cir. 2002); *Staten*, 187 Fed. Appx. at 359 (5th Cir. 2006); *Burrell v. Dr. Pepper/Seven Up Bottling Group*, 482 F.3d 408, 413 (5th Cir. 2007); *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015); *Campos*, 10 F.4th at 530 (5th Cir. 2021).

There is no contemporaneous evidence Clevenger had anything at all to do with Richmond's termination. ROA.287-292. It is also important to note that the first time Clevenger raises an issue with TeamOne is on November 6, 2020, which is *after* Richmond's announcement of her pregnancy to TeamOne and expression of her desire to take her full allotment of FMLA leave. ROA.656-657; ROA.659; ROA.715.

"As the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry." *Heinsohn*, 832 F.3d at 237-238 (quotations and citations omitted). TeamOne's post hoc addition of Clevenger as a justification for Richmond's termination, and the district court's heavy reliance on this justification in support of its opinion, is in error and independently indicative of pretext.

### 5.    Richmond Held Safety Meetings as Required

On March 4, 2021, shortly before Richmond's termination, Zavala responded to an email from White about CHSP meetings with the question: "What is the CHSP meeting?" ROA.697.

Richmond conducted safety meetings. ROA.575-576. The issue here is summed up in an email exchange between White and Hudson. ROA.697. White

writes: "Well this isn't good when the supervisor asks me what is a CHSP meeting?" Hudson responds: "Didn't this come up before and Lauralee explained? She was doing something in lieu or something[.]"

Hudson is right.  The single most important change Richmond spearheaded in turning around the Freeport terminal was an overhaul of the safety meeting procedure.  When Richmond started, most drivers were only expected to attend quarterly safety meetings.  ROA.575.  A more frequent monthly gathering of only a small committee of the most tenured drivers at the terminal was labeled as a Comprehensive Health and Safety Process ("CHSP") meeting.  ROA.575; ROA.638.  Contrary to the name, these CHSP meetings did not cover safety-related topics and were nothing more than a forum for experienced drivers to talk shop in the morning while devouring donuts.  ROA.575.

Richmond "found that to be incredibly ineffective" and re-branded the monthly CHSP meeting to feature *every* driver at the terminal so that that a culture of safety would be established.  ROA.575-576; ROA.638.  Going forward, Richmond held a full safety meeting for *all* the drivers *every* month.  ROA.611-612.  To maximize attendance, Richmond scheduled the safety meetings on Fridays, the slowest day of the workweek, at around noon when the Port of Freeport would be temporarily closed.  ROA.576-577.  Driver attendance averaged seventy to eighty percent, and Richmond would herself follow up with drivers who had a conflicting

obligation out on the road at the time of the meeting, and relay the topics discussed. ROA.577. This complied with TeamOne's directive to hold safety meetings "as required and necessary." ROA.256. There is <u>no</u> additional requirement to *document* these safety meetings in the "Safety Engagement Plan." ROA.256.

Moreover, TeamOne held the fact that Zavala was clueless about a CHSP meeting against Richmond. ROA.697. However, Zavala's ignorance cannot be attributed to Richmond because Zavala's employment with TeamOne predated Richmond's. ROA.616. To that point, Zavala seems to recall exactly what a CHSP meeting is the following day, when she reported to White that one had not occurred since before Richmond's tenure. ROA.82.

Meanwhile, the record demonstrates that Zavala's ensuing "complaint" about Richmond was not organic. ROA.701. Zavala was in conversation with White on March 4, 2021, during which she reported: "I will have a list of things for you tomorrow" and that she was "relieved to know you are working on this." ROA.701. What it appears TeamOne was "working on" was finding the reasons necessary to support a decision previously made to terminate Richmond, an effort that began with the write-up in December 2020.

On March 5, 2021, Zavala communicated to White the allegation that a purported February 23, 2021 CHSP meeting never took place and that a formal CHSP meeting had not been held at the Freeport terminal since before Richmond's

tenure. ROA.82. This is true but simply explained. Richmond did away with the CHSP designation—originally a monthly driver-led meeting of only four or five senior drivers comprising the CHSP committee—to improve safety at the previously struggling Freeport terminal. ROA.575; ROA.612; ROA.617-618. Richmond disbanded the smaller CHSP committee and in effect made "every driver a member of the CHSP" in that they all now attended a monthly safety meeting. ROA.575; ROA.617-618. This placed a greater emphasis on safety because Richmond had "all the drivers come in every month instead of five drivers once a month and all the drivers quarterly." ROA.617-618. Put simply, "[e]verybody became a CHSP member, we just didn't call it that anymore." ROA.618. Everybody included not just the drivers themselves but also Zavala, who was not only present for the monthly safety meetings but also spoke at them "every month." ROA.616.

TeamOne could have corroborated meeting dates with food receipts in expense reports Richmond submitted to TeamOne. ROA.614-615. As Richmond explained, "there was always corresponding receipts…if you're feeding thirty guys kolaches in the mornings you're gonna know." ROA.615.

### 6.     There is a Fact Issue on Who Controlled Richmond's Employment

TeamOne's position in its motion for summary judgment is that Richmond "was not supervised, managed, or jointly employed by UPS." ROA.73. A genuine issue of material fact can exist on the question of who supervised the employee.

*Heinsohn*, 832 F.3d at 238 (finding genuine issue of material fact on who is plaintiff-appellant's supervisor).

An employee can have joint employers under the "hybrid economic realities/common law control test." *Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117 118-19 (5th Cir. 1993) (quoting *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990)); *see also Burton*, 798 F.3d at 227-28 (5th Cir. 2015). One employer may "control an employee's conduct" while another employer may pay salary, withhold taxes, provide benefits, and set the terms and conditions of employment. *Burton*, 298 F.3d at 227.

Here, UPS clearly controlled Richmond's conduct. As a preliminary matter, Richmond's email address [lauraleerichmond@ups.com] indicates that she worked for UPS. ROA.649. Indeed, it is highly unusual that an employee would be given an organizational email address for an employer she does not work for.

Moreover, Richmond provided fleet services for UPS in support of UPS's client, Chiquita. ROA.565; ROA.637. Richmond interviewed with UPS Regional Director Whisman, who flew in and spoke with Richmond for close to an hour in-person, before she landed the job. ROA.564; ROA.568-570. Only after interviewing with UPS did Richmond participate in a brief phone interview with Messmer. ROA.570. The call with Messmer "was more of a formality" – Richmond

had aced the interview with UPS as Messmer let Richmond know that Whisman "couldn't stop talking about [her]."  ROA.570.

Whisman controlled Richmond's day-to-day activities.  ROA.561; ROA.578. Richmond used her UPS email address to communicate with both UPS and TeamOne.  ROA.649.  While Richmond might only talk once a week with White during a weekly scheduled safety call and even more sporadically with Messmer, she exchanged daily emails and phone calls with Whisman in addition to sending most of her documentation to him.  ROA.565-566.

This is important because Whisman was not consulted in the decision to terminate Richmond.  In fact, Whisman was totally in the dark as to what transpired. ROA.608-609.  He became upset upon hearing the news of Richmond's separation, employed "some pretty colorful language," and was adamant that he had not approved the action taken against Richmond, even going so far as to say that TeamOne "did not have permission to fire" Richmond.  ROA.608.

### 7.    This is Not a Summary Judgment Case

The evidence in this case suggests that different folks can draw different conclusions as to why Richmond was terminated and whether TeamOne's justifications are genuine.  This underscores why summary judgment is improper— reasonable minds can differ.  A summary judgment predicated on facts genuinely in dispute is improper.  "An issue of material fact is genuine if a reasonable jury could

return a verdict for the nonmovant." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010). In weighing the evidence, the court necessarily substitutes its judgment of the evidence for that of the jury. *See Tolan*, 572 U.S. at 657 (2014) (holding that court displayed a "clear misapprehension of summary judgment standards" when it credited the version of events from the witness of the summary judgment movant, while failing to credit the plaintiff's own recollection of events).

Moreover, it is important to look at the facts in this case in their entirety when deciding on pretext. As this Court recently reasoned in an employment case, "[i]t is necessary for the facts allegedly supporting a claim to be evaluated in their entirety." *Dabassi*, 107 F.4th at 506 (5th Cir. 2024). A *McDonnell Douglas* discrimination analysis "was never intended to be rigid, mechanized, or ritualistic." *Id.* (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S 567, 577 (1978)).

Instead, "[j]ust as '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, . . . similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'" *Donaldson v. CDB Inc.*, 335 Fed. Appx. 494, 503 (5th Cir. 2009) (citations omitted); s*ee also Starnes v. Wallace*, 849 F.3d 627, 635 (5th Cir. 2017) (reversing summary judgment for the employer in an employment case and emphasizing the importance of looking at the "big picture" in analyzing whether there is sufficient evidence of pretext to find for the plaintiff).

The big picture demonstrates that a genuine issue of fact exists on whether TeamOne's termination of Richmond was impermissibly motivated by her pregnancy. TeamOne is not entitled to a judgment as a matter of law.

## CONCLUSION

Richmond asks this Court to reverse the summary judgment granted against her and remand this case to the district court for trial or further proceedings consistent with its Opinion.

Respectfully submitted,

/s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
712 Main Street, Suite 900
Houston, TX 77002
713-401-3558 – Telephone
ak@ahadkhanlaw.com - Email

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was filed with the United States Court of Appeals for the Fifth Circuit and served electronically via the ECF filing system upon counsel of record listed below on the 10th day of February 2025.

Hunter Johnson
Tammy C. Woolley
Constangy, Brooks, Smith & Prophete, LLP
1201 Elm Street, Suite 2550
Dallas, TX 75270

/s/ Ahad Khan
Ahad Khan
Counsel for Plaintiff-Appellant

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1 because this document contains 11,155 words.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 16.93 with a 14-point font named Times New Roman.

/s/ Ahad Khan